## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

CHRISTY BAILEY, as Personal     )
Representative of the Estate     )
of Jeffrey Peterson, deceased,   )
                                   )
           Plaintiff,     )
                                   )
v.                            )     Case No. CIV-20-327-JAR
                                   )
CITY OF ADA;              )
OFFICER MARCUS BEALE;      )
OFFICER JUSSELY CANADA;    )
OFFICER MICHAEL MEEKS; and  )
OFFICER PHILLIP VOGT.     )
                                   )
          Defendants.   )

## OPINION AND ORDER

    This matter comes before the Court on the following motions: (1) Motion for Summary Judgment filed by Defendants Officer Jussely Canada, Officer Michael Meeks, and Officer Phillip Vogt (Docket Entry #93); (2) Motion for Summary Judgment filed by Defendant City of Ada (Docket Entry #94); and (3) Motion for Summary Judgment filed by Defendant Officer Marcus Beale (Docket Entry #95).

### Facts Relevant to All Claims

    Officers Canada, Meeks, and Vogt are all CLEET certified officers with the City of Ada, Oklahoma Police Department. On September 21, 2019, these Officers received a call for assistance from Officer Marcus Beale, also a CLEET certified officer with the City of Ada, who was at the scene of an apartment rented by Jeffrey Peterson ("Peterson"). Officer Canada was the first of the backup

officers to arrive.  She observed Officer Beale up against the closed door of Peterson's apartment and a female, identified as Megan Timmons ("Timmons") was standing over to the side at the apartment.  (Canada Depo., p. 29, ll. 1-13).  Officer Canada never attempted to make contact with Timmons prior to entering Peterson's apartment.  She was asked for assistance by Officer Beale which she deemed more important at the time.  (Canada Depo., p. 39, ll. 8-14).

Officer Canada went to Officer Beale, who had his duty weapon drawn.  (Canada Depo., p. 29, ll. 14-19).  Seeing Officer Beale's weapon, Officer Canada also drew her weapon.  (Canada Depo., p. 30, ll. 4-6).  Officer Beale told Officer Canada that Peterson had slammed the apartment door on Officer Beale's arm as he tried to enter the apartment.  (Canada Depo., p. 38, ll. 5-7).  She also stated that Peterson "told officers that he was going to treat us as intruders if we went into the residence" although she did not attribute this statement to Officer Beale.  (Canada Depo., p. 33, ll. 23-25, p. 34, ll. 1-2).  Officer Canada did not know what happened before she arrived, only what she was told by Officer Beale.  (Canada Depo., p. 38, ll. 1-4).  She only knew that Officer Beale had told her that Peterson had committed assault and battery on a police officer when the door was allegedly slammed upon Officer Beale's arm.  (Canada Depo., p. 34, ll. 17-24).

Officer Canada did not know if Officer Beale had any injuries resulting from the slamming of the door on his arm. (Canada Depo. p. 38, ll. 5-16). She did not hear him complain of any pain or soreness in his arm. (Canada Depo. p. 38, ll. 21-25).

Officer Canada testified that the other officers arrived on the scene in "[a] matter of moments." (Canada Depo. p. 39, ll. 1-7). Officer Meeks arrived with Officer Vogt, who was in training with Officer Meeks. (Meeks Depo., p. 26, ll. 14-24). Officer Meeks and Officer Vogt arrived at the Peterson apartment and observed Officer Beale and Officer Canada on the front porch. They also approached the front porch where Officer Canada briefed Officer Meeks. (Meeks Depo., p. 30, ll. 1-9). Officer Meeks understood that "there was some sort of threats that had been made." (Meeks Depo., p. 30, ll. 10-13). Officer Meeks did not recall speaking with Officer Beale before the apartment door was breached. (Meeks Depo. p. 31, ll. 1-3).

Officer Meeks stated that he believed Officer Beale was trying to gain access into Peterson's apartment, stating "from what Officer Canada said and Officer Beale's actions, I proceeded (sic) that some sort of maybe threats or maybe some sort of assault that had occurred." (Meeks Depo., p. 31, ll. 9-12). He believed that there was a "serious threat", "[t]aking the totality of what I was told and what I saw. . . ." (Meeks Depo., p. 32, ll. 6-9).

3

Officer Meeks observed Officer Beale trying to gain access through the apartment door several times.  Officer Beale tried to holster his weapon but ultimately placed it on a concrete pillar on the front porch.  Officer Meeks grabbed the gun, deciding that the porch was "probably not the best place for it" and gave it to Officer Vogt.  (Meeks Depo., p. 32, ll. 11-18).  Meeks holstered his weapon so that he could use both hands to arrest or detain Peterson.  (Meeks Depo., p. 32, ll. 19-25, p. 33, ll. 1-2).  He did not know if Peterson was armed.  (Meeks Depo., p. 34, ll. 14-16).  Officer Meeks believed that entry to the house had to be made because "something had happened prior to [his] arrival with Officer Beale and that he was in hot pursuit of a suspect."  (Meeks Depo., p. 34, ll. 13-20).

A review of Officer Canada's body camera reveals that Officer Beale attempted to repeatedly force the door open but it would close again.  (Canada Video at 15:00:10).  Officer Meeks then gets behind Officer Beale to jointly push their way through the apartment door.  (Canada Video at 15:00:17).  Officer Beale stated, "You done f***** up, man."  (Canada Video at 15:00:21).  Officer Canada can then be seen placing her hand on Officer Meeks' back to assist in pushing through the door.  (Canada Video at 15:00:22).  Officer Vogt cannot be seen pushing through the door but Officer Meeks testified that he came behind Officer Canada.

(Meeks Depo., p. 33, ll. 25, p. 34, ll. 1-2).  The Officers then gain access to the apartment by forcing their way through the door. (Canada Video at 15:00:25).  Officer Beale and Officer Meeks physically struggle with Peterson who resists their attempts to restrain him.  (Canada Video at 15:00:28).  Officer Canada then deploys a taser on Peterson multiple times.  (Canada Video at 15:00:31, 15:00:36).  Officer Meeks begins yelling "Cuff him, cuff him, cuff him".  (Canada Video at 15:00:41).  Officers Beale, Meeks, and Vogt become visible on the video, struggling to restrain Peterson while Officer Canada continues to deploy her taser. (Canada Video at 15:00:41).  Officer Vogt attempts to place handcuffs on Peterson while Officers Beale and Meeks continue their physical struggle with Peterson.  (Canada Video at 15:00:48). Officer Vogt's efforts are unsuccessful.  (Canada Video at 15:00:52).  Officer Meeks begins screaming.  (Canada Video at 15:00:57).  Officer Beale disengages from his struggle with Peterson and becomes "wrapped up" in the lead lines from Officer Canada's taser.  (Canada Video at 15:01:14).  Officer Meeks continued to struggle with Peterson in the corner of the apartment. (Canada Video at 15:01:17).  Officer Meeks then begins screaming "going for my gun."  (Canada Video at 15:01:25).  A taser continues to be audibly deployed.  (Canada Video at 15:01:26). Officer Canada then calls dispatch for "more units."  (Canada

5

Video at 15:01:29).  Officer Meeks again yells "going for my gun."
(Canada Video at 15:01:33).  Officer Beale can be seen pointing a
weapon in the direction of Officer Meeks and Peterson, yelling
"watch out, watch out."  (Canada Video at 15:01:39).  Officer
Meeks again yells "going for my gun."  (Canada Video at 15:01:43).
Gun shots are heard in the video from Officer Beale's weapon.
(Canada Video at 15:01:46).  Officer Canada advises dispatch
"shots fired, shots fired."  (Canada Video at 15:01:47).  Officer
Canada then tells dispatch "roll EMS."  (Canada Video at
15:01:52).

Officer Meeks testified that when he entered the apartment
behind Officer Beale, Peterson was "making contact" with Officer
Beale "in the face area" while Officer Beale was trying to grab
Peterson's hands.  (Meeks Depo., p. 42, ll. 10-22).  Peterson and
Officer Beale then traded punches when they ended up on the couch
with Peterson on top of Officer Meeks and both of them continuing
to throw punches.  (Meeks Depo., p. 42, ll. 24-25; p. 43, ll. 1-
3).  He testified that Peterson then tried to grab Officer Beale's
gun but it was not in the holster.  (Meeks Depo., p. 43, ll. 5-
7).  Officer Meeks also tried to grab Peterson's arms and body.
(Meeks Depo., p. 43, ll. 24-25).

Officer Meeks also believed Officer Beale told Officer Canada
to tase Peterson, which she attempted with little effect.  (Meeks

Depo., p. 45, ll. 6-9).  Officer Meeks stated when he tried to handcuff Peterson but Peterson grabbed for his gun.  (Meeks Depo., p. 45, ll. 9-13).  Officer Meeks stated that he screamed in order to direct Peterson's attention so he turned toward the Officer. (Meeks Depo., p. 45, ll. 24-25; p. 46, l. 1).  Peterson got off Officer Beale and continued struggling with Officer Meeks, trying to strike Officer Meeks numerous times throughout the incident. (Meeks Depo., p. 46, ll. 4-10).  Officer Meeks did not see Peterson try to strike either Officer Canada or Officer Vogt.  (Meeks Depo., p. 46, ll. 11-15).

Officer Meeks could "feel [Peterson] trying to reach for my gun."  (Meeks Depo. p. 46, ll. 23-24).  He could feel Peterson's hand on his holster and the handle of the gun.  (Meeks Depo., p. 47, ll. 1-2).  Officer Meeks stated Peterson "actually got ahold of the handle and put his hands or fingers around the handle of my – my gun that was still in my holster and was trying to lift up, pull it out of the holster.  And during those times I actually said or screamed, he's going for my gun, he's trying to get my gun."  (Meeks Depo., p. 47, ll. 18-24).  Officer Vogt testified that when Officer Meeks screamed, he looked over Peterson's shoulder and could "see that his left arm is on Officer Meeks' firearm with the retention broken, and I see the firearm's being pulled out as Officer Meeks is using both of his arms to attempt

to push it back into the holster." (Vogt Depo., p. 36, ll. 3-9).

Officer Canada stated that she observed Peterson trying to get Officer Meeks' duty weapon out of his holster. (Canada Depo. p. 53, ll. 23-24). She testified that she saw Peterson "grabbing ahold of Officer Meeks' pistol and trying to grab it out of the holster" with his left hand. (Canada Depo. p. 54, ll. 4-7). Officer Canada saw Officer Beale use his taser on Peterson. (Canada Depo., p. 54, ll. 11-15). She looked down and saw one of the Officer's duty pistols on the ground. (Canada Depo., p. 54, ll. 19-20). Officer Beale asked Officer Canada for the duty pistol on the floor. She handed him the weapon. Officer Beale then shot Peterson three times while Peterson continued to grapple with Officer Meeks. Peterson died from his wounds.

Plaintiff brought this action on September 21, 2020, alleging (1) a violation by all Defendants of Peterson's First, Fourth, and Fourteenth Amendment constitutional rights as enforced through 42 U.S.C. § 1983 by "illegally seizing Plaintiff, illegally entering Plaintiff's home, using excessive force, failing to intervene to prevent the deprivation of [Peterson's] rights, retaliating against [Peterson] for the exercise of his rights, and acting in concert to commit these constitutional violations, Defendants exhibited an unreasonable and deliberate indifference to [Peterson's] rights."; (2) wrongful death against all Defendants;

(3) intentional infliction of emotional distress against the Defendant Officers; (4) negligent hiring, training, and retention against Defendant City of Ada ("City"); (5) assault and battery against all Defendants; and (6) an Open Records Act violation against Defendant City.

### General Law Governing Summary Judgment

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Universal Money Centers v. A.T. & T., 22 F.3d 1527, 1529 (10th Cir.), _cert. denied_, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994).  The moving party bears the initial burden of showing that there is an absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553-54, 91 L.Ed.2d 265 (1986).  A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed 2d 202 (1986).  In determining whether a genuine issue of a material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party.  Adickes v. S.H.

Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).  Once the moving party has met its burden, the opposing party must come forward with specific evidence, not mere allegations or denials of the pleadings, which demonstrates that there is a genuine issue for trial.  Applied Genetics v. Fist Affiliated Securities, 912 F.2d 1238, 1241 (10th Cir. 1990); Posey v. Skyline Corp., 702 F.2d 102, 105 (7th Cir. 1983).

## Summary Judgment Request of Officers Canada, Meeks, and Vogt

Officers Canada, Meeks, and Vogt first assert they are entitled to qualified immunity and, in doing so, first asserts that no violation of the Fourth Amendment occurred.  "Individual defendants named in a § 1983 action may raise a defense of qualified immunity," Cillo v. City of Greenwood Village, 739 F.3d 451, 459 (10th Cir. 2013), which "shields public officials . . . from damages actions unless their conduct was unreasonable in light of clearly established law," Gann v. Cline, 519 F.3d 1090, 1092 (10th Cir. 2008)(quotations omitted).  Generally, "when a defendant asserts qualified immunity, the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's

unlawful conduct." Cillo, 739 F.3d at 460.

While Plaintiff identifies a litany of alleged constitutional violations in the Complaint, she limits her discussion within the response to the summary judgment motion to the warrantless entry into Peterson's apartment and excessive force.  This Court will, therefore, consider any other alleged violation as abandoned.  The remaining two bases for an alleged constitutional violation will be addressed in turn.

The Fourth Amendment imposes strict limits on when law-enforcement officers may enter a home without a warrant. *See* United States v. McCullough*, 457 F.3d 1150, 1163 (10th Cir. 2006) ("'It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.'") (quoting Payton v. New York*, 445 U.S. 573, 586, (1980)).

A warrantless entry into a home may be justified, however, in certain exceptional circumstances. *See* Coolidge v. New Hampshire*, 403 U.S. 443, 474-75 (1971) ("It is accepted, at least as a matter of principle, that a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'

11

"); *see also* <u>Brigham City v. Stuart</u>*,* 547 U.S. 398, 403 (2006) ("We have held, for example, that law enforcement officers may make a warrantless entry onto private property to fight a fire and investigate its cause, to prevent the imminent destruction of evidence, or to engage in 'hot pursuit' of a fleeing suspect." (internal citations omitted)); <u>Georgia v. Randolph</u>*,* 547 U.S. 103, 116 n. 6 (2006) (listing "hot pursuit," "protecting the safety of ... police officers," "imminent destruction [of a] building," "likelihood that [a] suspect will imminently flee," and "a fairly perceived need to act on the spot to preserve evidence" as exigent circumstances that might justify a warrantless search of a residence).

In this case, Officers Canada, Meeks, and Vogt consistently stated that they relied upon what they were told by Officer Beale as to the justifying circumstances for a warrantless entry of Peterson's apartment.  The bases provided by Officer Beale were (1) he had been assaulted by Peterson; (2) Peterson threatened further violence against Officer Beale by stating he would be "treated like an intruder"; and (2) after assaulting Officer Beale, Peterson fled into his apartment.  Officer Beale's representations were all that Officers Canada, Meeks, and Vogt knew and relied upon in their subsequent actions of following Officer Beale into

Peterson's apartment.  The foundation for their continued actions in this encounter would have represented exigent circumstances justifying a warrantless entry into the apartment under the clearly established law existing at the time, so long as (1) they were entitled to rely upon Officer Beale's representations; and (2) it was objectively reasonable to do so.

This is not a novel concept in the Tenth Circuit case authority.  In Stearns v. Clarkson, the Tenth Circuit stated

> When one officer requests that another officer assist in executing an arrest, the assisting officer is not required to second-guess the requesting officer's probable cause determination, nor is he required to independently determine that probable cause exists. *See* Baptiste v. J.C. Penney Co., 147 F.3d 1252, 1260 (10th Cir. 1998) ("An officer who is called to the scene to conduct a search incident to arrest is not required to reevaluate the arresting officer's probable cause determination in order to protect herself from personal liability.").  Rather, "a police officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable." Id. (quotations omitted).
>
> Stearns, 615 F.3d 1278, 1286 (10th Cir. 2010).

Officers Canada, Meeks, and Vogt, faced with a emergent situation, were reasonable in their reliance upon Officer Beale's

representations of the circumstances presented. Plaintiff is critical of several of these Officers' actions. She contends that Officer Beale never relayed his assault over the radio or deemed the situation an emergency. This does not diminish the increased level of threat communicated by Officer Beale to the assisting Officers when these Officers arrived and their reliance upon those representations. Similarly, Officer Beale told the assisting Officers that his arm was slammed in the door but Plaintiff contends they did not observe any injury. The Officers were not required to investigate the level of injury sustained by Officer Beale before acting in concert with him to enter the apartment.

Plaintiff also states that Timmons does not support Officer Beale's version of the facts. This may have an effect upon Officer Beale's status in this action but it does not affect the reasonableness of the reliance of Officers Canada, Meeks, and Vogt upon Officer Beale's representations.

Considering what these Officers knew and when they knew it based entirely upon Officer Beale's version of the facts, this Court concludes that these Officers are entitled to qualified immunity for their actions in entering Peterson's apartment without a warrant.

The Fourth Amendment to the Constitution also precludes an

illegal "seizure" of a citizen through the use of excessive force. U.S.C.A. Const. Amend. IV.   The question to be answered in a qualified immunity context on excessive force claims is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Graham v. Connor, 490 U.S. 386, 397 (1989).   Under the totality of the circumstances approach, the court is required to consider a balance of the factors of "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.   If the force employed is deadly force, the officer's use of force is reasonable only "if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." Estate of Larsen ex re. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008); *see also* Tennessee v. Garner, 471 U.S. 1, 11 (1985).   An important aspect of the inquiry is "whether the officers were in danger at the precise moment that they used force." Phillips v. James, 422 F.3d 1075, 1083 (10th Cir. 2005).

Considering only the actions of Officers Canada, Meeks, and

Vogt, this Court cannot conclude that they exhibited an objectively unreasonable level of force.   After entry, Peterson immediately physically confronted the Officers.   All evidence indicates that Peterson punched, grappled with, and attempted to disarm Officer Meeks while Officer Canada deployed a taser in an effort to end Peterson's altercation with Officers Meeks and Beale.

The second prong of the qualified immunity test requires that this Court determine that the law was clearly established at the time of the incident.   In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she violated that right.   Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).   "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"   Lobozzo v. Colo. Dept. of Corr., 429 Fed.Appx. 707, 710 (10th Cir. 2011).   "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."   Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). *see also* Medina, 960 F.2d at 1498.

16

On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

To be clear, Officers Canada, Meeks, and Vogt did not employ the deadly force which resulted in Peterson's death. Only Officer Beale discharged his weapon into Peterson.[1] Plaintiff's

---

[1] To the extent Plaintiff asserts a claim of failure to intervene against Officers Canada, Meeks, and Vogt, such a claim would require a showing that (i) the Officers were present at the scene; (ii) the Officers witnessed another officer applying force; (iii) the application of force was such that any reasonable officer would recognize that the force being used was excessive under the circumstances; and (iv) the Officers had a reasonable opportunity to intercede to prevent the further application of excessive force, but failed to do so. Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)). The record does not indicate Officers Canada, Meeks, or Vogt had an opportunity to intervene with Officer Beale's application of deadly force or that the application of deadly force was objectively unreasonable under the circumstances.

protestations to the contrary, once Peterson was aware the entrants to his apartment were police officers, he could have ended the violent physical altercation and he certainly could have ended his attempts to unholster Officer Meeks' weapon.  These actions went beyond mere efforts to defend himself and established him as the aggressor once the officers entered the apartment.  This Court cannot conclude that the level of force employed by Officers Canada, Meeks, and Vogt violated clearly established law.  These Officers are entitled to qualified immunity on the excessive force claim.

The remaining state law claims against Officers Canada, Meeks, and Vogt of wrongful death, intentional infliction of emotional distress, and assault and battery are based in the Oklahoma Governmental Tort Claims Act ("OGTCA").  However, "[i]n no instance in any such action shall an employee of the state or of a political subdivision of the state acting within the scope of employment be named as defendant; provided, however, such person may be named as defendant under alternative allegations that such person did not act within the scope of employment."  Okla. Stat. Ann. tit. 51, § 153.  An employee is acting within the "scope of employment" when the "performance by an employee acting in good faith within the duties of the employee's office or employment or of tasks lawfully assigned by a competent authority including the

operation or use of an agency vehicle or equipment with actual or implied consent of the supervisor of the employee, but shall not include corruption or fraud."  Okla. Stat. Ann. tit. 51, § 152.

Nothing in the record indicates to this Court that Officers Canada, Meeks, and Vogt were not acting in good faith or in the scope of their employment as city police officers.  Based upon the information communicated to them by Officer Beale, they were acting appropriately to apprehend a suspect who had assaulted a police officer.  As such is the case, the Officers are immune from liability under the claims based in the OGTCA and those claims are subject to dismissal.

### Additional Facts Relevant to the Summary Judgment Request of Officer Beale

Timmons stayed at Peterson's apartment "maybe three nights out of a week". (Timmons Depo., p. 27, ll. 22-23).  She did not pay any of the bills but kept the apartment clean and put a couch and some tablecloths in the apartment. (Timmons Depo., p. 27, ll. 12-18).  Peterson and Timmons were friends but she would not let him kiss her on the cheek or hold hands. (Timmons Depo., p. 19, ll. 5-8).  In a "short amount of months", Timmons and Peterson became close friends.  She started staying in the apartment because Peterson was arrested and the officers gave her his car keys and house keys. (Timmons Depo., p. 20, ll. 19-25).  When

19

Peterson got out of jail, he told Timmons he was never at the apartment because of work and she could stay. (Timmons Depo., p. 22, ll. 7-9). Timmons found Peterson to be unhappy and "just really aggressive". (Timmons Depo., p. 29, ll. 6-9).

A few days before his death, Peterson forgot to give Timmons a key to the apartment. To gain access, Timmons "drop-kicked the door, and it busted a little bit out the bottom of the door on the inside." (Timmons Depo., p. 17, ll. 19-22). Timmons "pressed it back on there" but it was "pretty wobbly" and someone would be able to just push their way in. It still locked. (Timmons Depo. P. 19, ll. 12-25).

The night before the incident, Timmons brought a homeless man to the apartment from a Love's convenience store. Peterson objected but played video games with the homeless man all night. (Timmons Depo., p. 30, ll. 2-17). Timmons woke up early the next morning but she could not find any of her stuff in the apartment. (Timmons Depo., p. 30, ll. 21-25). Peterson "was pissy" at Timmons and walked her out of the apartment. She turned around to go back in the apartment because she did not have her stuff and Peterson shut the door. (Timmons Depo., p.31, ll. 4-8). Peterson would not let Timmons back in the apartment. He gave her $11.00 and her phone, which he had altered. (Timmons Depo., p. 31, ll. 17-24).

20

Timmons still had belongings bagged and boxed in Peterson's laundry room.  (Timmons Depo., p. 33, ll. 5-10).

Timmons threatened to call the police if Peterson did not return her belongings, stating, "I know you're scared of them, so you better not start with me.  Give me back my stuff."  (Timmons Depo., p. 34, ll. 18-20).  Timmons called the police because she knew Peterson was not going to give her stuff back to her. (Timmons Depo., p. 40, ll. 9-10).  She told the police what was going on and they agreed to send someone to help Timmons get her stuff.  (Timmons Depo., p. 40, ll. 15-16).

Officer Beale responded to the call.  His goal was to retrieve Timmons belongings.  (Beale Depo., p. 50, ll. 18-19).  Timmons knocked on the door to the apartment.  The door wobbled and Officer Beale told her it was open.  Timmons opened the door.  Officer Beale saw that trim and nails were sticking out around the door and he put his hand up to hold the trim so the nails would not hit them.  They then attempted to go into the apartment.  Officer Beale did not announce himself because he was with Timmons and believed that she stayed in the apartment.  (Beale Depo., p. 51, ll. 13-23).  Officer Beale began entering the apartment.  He testified that his forearm was holding the trim on the inside of the door when he heard stomping and the door slammed on his left

forearm.  (Beale Depo., p. 54, ll. 2-7).  Officer Beale put his right shoulder into the door to prevent further pressure on his forearm while trying to remove his arm from the doorway.  (Beale Depo., p. 54, ll. 10-12).[2]  Officer Beale then announced he was with the police department.  He shoved the door to get his forearm loose.  He announced that he was there trying to help Timmons get her stuff so she could leave and they could be done with the situation.  (Beale Depo., p. 55, ll. 1-8).  Officer Beale testified that Peterson yelled and threatened through the door. He asked Peterson to put Timmons' stuff at the back door but Peterson said he would not do it until Officer Beale left.  Officer Beale did not feel comfortable leaving Timmons at the apartment. He called for back up.  (Beale Depo., p. 56, ll. 21-25; p. 57, ll. 1-6).  Officer Beale unholstered his weapon because Peterson was threatening him, telling Officer Beale he would "shoot me like an intruder."  (Beale Depo., p. 58, ll. 21-25).

Timmons testified that she grabbed Officer Beale's arm and tried to stop him from entering the apartment.  She told him, "This has gone too far, and I'm sorry.  Like, I did not want this. He's not going to give me my stuff.  It's okay.  I'm going to go."

---

[2] Officer Beale did not complain about his arm when he went to the doctor.  He did not suffer any bruising and any injury to his arm was not reported in the medical records of his visit.  (Beale Depo., p. 69, ll. 7-18; p. 72, ll. 14-20).

(Timmons Depo., p. 46, ll. 16-25).  Timmons then ran to a tree.

Timmons provided a statement to the Oklahoma State Bureau of Investigation after the incident.   (Plaintiff's Response to Beale's Motion for Summary Judgment, Exh. 5).  Timmons indicated in that statement that she knocked on the door to Peterson's apartment, then Officer Beale knocked on the door.   The door wobbled and Officer Beale asked Timmons if the door was open.  She told him no, that it was just wobbly, and pushed in the door a little bit to show Officer Beale.  Peterson then slammed the door shut.   Timmons did not reference that Officer Beale's arm was caught in the door.  Timmons also does not state that Beale was holding the door frame up at the time the door was slammed.  Id.

Timmons testified that when she attempted to go through the door, Peterson hit the door, the door hit Timmons and Timmons hit Officer Beale.   Officer Beale was to the left of Timmons. (Timmons Depo., p. 48, ll. 22-24).  Timmons stated that Officer Beale's arm did not get caught in the door when Peterson slammed it shut.  (Timmons Depo., p. 49, ll. 5-9).  She further testified that Peterson did not let the door come open.  (Timmons Depo., p. 49, ll. 19-25).[3]

As previously stated, the primary bases for a warrantless

---

[3] No body camera footage was offered into evidence from Officer Beale's body camera.

entry into Peterson's apartment was the alleged assault upon
Officer Beale by slamming his arm in the door and Peterson's flee
into the apartment.   A significant, material factual dispute
precludes summary judgment on this claim, including the defense of
qualified immunity.

Moreover, the facts are muddled and disputed as to whether
Timmons was a resident or guest in Peterson's apartment such that
she could give Officer Beale consent to enter the apartment.   This
Court recognizes the authority of Illinois v. Rodriguez, 497 U.S.
177 (1990) which stands for the proposition that "[t]he
Constitution is no more violated when officers enter without a
warrant because they reasonably (though erroneously) believe that
the person who has consented to their entry is a resident of the
premises, than it is violated when they enter without a warrant
because they reasonably (though erroneously) believe they are in
pursuit of a violent felon who is about to escape." Illinois v.
Rodriguez, 497 U.S. 177, 186 (1990).   The problem in the facts in
this case lies in Timmons testimony that she attempted to pull
Officer Beale away from entering the home, indicating that she did
not consent to his entry into the apartment.   Thus, even if it was
reasonable to believe Timmons (erroneously or correctly) was a co-
tenant with the capacity to give consent, the facts would lead to
the conclusion that she did not give her acquiescence to Officer

24

Beale's entry.

As for the Fourth Amendment excessive force claim, the law was clearly established at the time of this incident that deadly force was only justified when a suspect "poses a significant threat of death or serious physical injury to the officer or others." Garner, 471 U.S. at 3. Despite Plaintiff's assertions that a dispute exists in the facts as to whether Peterson was attempting to unholster Officer Meeks' weapon, this Court finds overwhelming evidence that Peterson had his hand on the weapon at or near the time of the use of deadly force. Even considering Officer Beale's testimony that he could not see Peterson's hands when he fired but could see his arms near Officer Meeks' weapon and hearing Officer Meeks yell that Peterson was attempting to unholster his weapon, it was reasonable for Officer Beale to believe that Peterson posed a significant threat to himself and the other Officers present in the struggle.

The fact remains that the disputed claim that Officer Beale violated Peterson's constitutional right to be free of a warrantless search could be found to have lead to the death of Peterson and the resulting damages. Such disputes are in the exclusive province of the jury as factfinder and not appropriately resolved on summary judgment under the facts presented in this case.

As for the state law claims asserted against Officer Beale, the question under the OGTCA turns on whether he was acting within the scope of his employment at the time he entered Peterson's apartment. As noted, this entails a question of fact regarding consent to enter and the warrantless entry. "Whether a police officer's actions were taken within the scope of employment is a jury question unless only one reasonable conclusion can be drawn from the facts alleged." <u>Tuffy's, Inc. v. City of Oklahoma City</u>, 212 P.3d 1158, 1167 (Okla. 2009). Here, more than one conclusion can be drawn due to the dispute in the facts. As a result, dismissal of the state law claims is inappropriate on summary judgment.[4]

### Additional Facts Relevant to the Summary Judgment Request of the City of Ada

The City hires officers through East Central University's Collegiate Officer Program ("COPS"). According to Carl Allen, the current City of Ada Chief of Police and the deponent designated to speak for the City on issues of training of its officers, the COPS program takes students who have a concentration in criminal justice or human resource to enter the program as "basically the equivalency of an internship" with the same amount of hours as the

---

4 It should be noted that Officer Beale only sought summary judgment on the state law claims based upon the immunity provided under the OGTCA. The merits of the various state law claims were not directly addressed.

Council of Law Enforcement Education and Training ("CLEET") basic course. (Allen Depo., p. 18, ll. 20-25; p. 19, ll. 1-6). CLEET recognizes the COPS program as the equivalency of CLEET's basic academy. (Allen Depo., p. 19, ll. 10-12). The City relies upon COPS being good training with that training recognized by CLEET. (Allen Depo., p. 20, ll. 24-25; p. 21, ll. 1-2). Additionally, the City depends upon CLEET certification training for situations such as entering dwellings in the officer meeting certain criteria to be employed as a law enforcement officer. (Allen Depo., p. 24, ll. 13-19). The City also provides field training with a Field Training Officer to train newly hired officers in areas such as mental health training and entering private residences. This training is also included in the minimum annual mandated training requirements for continuing education. (Allen Depo., p. 32, ll. 6-32; p. 33, ll. 1-4). The required field training is also set out in the City's Field Training Policy Manual. This manual includes benchmarks that have to be reached in order to pass through the field training program. (Allen Depo., p. 33, ll. 5-14). Officers with the City are required to do a minimum of 24 hours of continuing education every year as well as a couple of hours of mental health. This includes hands on training where officers do defensive tactics and use of force training. If any

issues arise, they are identified through field training.  (Allen Depo., p. 25, ll. 4-14).

Officer Beale had COP certification which is equivalent to CLEET certification.  (Allen Depo., p. 26, ll. 16-17).  He is also CLEET certified and has received at least the minimum 24 hours of continuing training each year he was an active police officer. (Motion for Summary Judgment by Defendant City of Ada, Exh. No. 12).

While going through field training, one field training officer out of three in 2016 found Officer Beale was not ready to be released from the field training officer because of his "least acceptable performance in the area of problem solving/decision making.  (Plaintiff's Response to City of Ada's Motion for Summary Judgment, Exh. No. 6).  Officer Beale was passed through the field training program despite this recommendation.  Id.

Officer Beale received deadly force training while in the COPS program, de-escalation training through CLEET, and dealing with individuals experiencing emotional or mental health episodes through the field training program and CLEET.  (Beale Depo. P. 29, l. 25; p. 30, ll. 1-25).

Chief Allen agreed that Officer Beale's placing of his firearm on the pillar outside of Peterson's apartment was a violation of

policy.   (Allen Depo., p. 49, l. 25; p. 50, ll. 1-5).   Officer Beale received additional training on firearms handling as a result of this violation.   (Allen Depo., p. 80, ll. 10-23).

Plaintiff also points to an incident from August of 2016 where Officer Beale fired ten shots at a vehicle as it was driving away. The other officer at the scene, Carl Dewayne Campbell, stated that Officer Beale's discharge of his weapon was not necessary, in his opinion.   (Campbell Depo., p. 13, ll. 18-22).   He attempted to stop Officer Beale by yelling "whoa."   (Campbell Depo., p. 18, ll. 20-25, p. 19, ll. 1-5).   To his knowledge, Officer Beale received training in discharging a weapon through the COPS program. (Campbell Depo., p. 19, ll. 20-25).

Municipal liability attaches under § 1983 when a constitutional violation results from a municipality's: (i) official policy; (ii) custom or practice; or (iii) failure to train employees.  City of Canton v. Harris, 489 U.S. 378, 380, 387, (1989); Monell v. Department of Social Services of City of New York, 436 U.S. 658, 690-91 (1978).  Plaintiff has not identified a policy, custom, or practice which would be subject the City to municipal liability.   Instead, Plaintiff focuses almost exclusively upon the City's failure to train its officers in the use of deadly force and properly entering a dwelling.

To prevail on a claim that the City failed to train Officer Beale[5], a plaintiff must show that the municipality made a "deliberate or conscious choice" to not train its employees, and that the municipality was deliberately indifferent to its inhabitants' constitutional rights. <u>Manzanares v. Roosevelt Cnty. Adult Det. Ctr.</u>, 331 F. Supp. 3d 1260, 1300 (D.N.M. 2018) citing <u>City of Canton v. Harris</u>, 489 U.S. at 388-89. Plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need" for additional training. Ordinarily, "[p]roof of a single incident of unconstitutional activity is not sufficient to impose [municipal] liability." In the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued. <u>Jenkins v. Wood</u>, 81 F.3d 988, 994 (10th Cir. 1996); *see also* <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378 (1989) ("Only where a failure

_____

5 Since this Court has previously in this Opinion and Order found the Officer Canada, Meeks, and Vogt did not violate Peterson's constitutional rights and were entitled to qualified immunity, the analysis on Plaintiff's failure to train claim will focus exclusively on Officer Beale.

to train reflects a 'deliberate' or 'conscious' choice by an municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983").

Officer Beale received training through the COPS program and through CLEET certification.  These programs offer training in the areas of use of force and entering a dwelling.  Plaintiff appears to be contending that after the incident of firing on the vehicle, Officer Beale should have received additional training. Plaintiff also contends obliquely that Officer Beale's passing from the field training program against the recommendation of one trainer represented a training deficiency. These incidents occurred some three years before the use of deadly force in this case.  Officer Beale indisputably continued to receive training through annual CLEET requirements.  Therefore, it would be impossible for this Court to determine that the City made a deliberate choice to not train its officers to the detriment of its citizens' constitutional rights.  Indeed, CLEET certification itself has been determined in this Court to support a finding of adequate training in this District.  Jones v. Hacker,  2015 WL 1279363, at *8 n.7 (E.D. Okla. Mar. 20, 2015)("CLEET-certification supports summary judgment with respect to any argument that the City had a policy or custom of failing to train or supervise its officers." citing

Rollins v. Town of Haskell, Okla., 2009 WL 3614784, at *10
(E.D.Okla. 2009)).   Plaintiff finds fault in Chief Allen's
inability to specifically identify the curriculum of CLEET and
COPS training programs.   Reliance upon these programs to provide
training to the officer does not represent an abandonment of the
City's obligation to train – rather, it indicates an effort to use
these established training programs to meet its needs in insuring
uniform training for its officers.   This Court finds no
constitutional deficiency in the City's training of Officer Beale
such that municipal liability can be conferred.

Although Plaintiff also brings claims in the Complaint for
negligent hiring and retention against the City, Plaintiff has
offered no evidence to support these claims.   Consequently, the
City is entitled to summary judgment on these claims.

Plaintiff asserts claims against the City based in state law
for wrongful death, assault and battery, and an Open Records Act
violation.   The City relies upon the briefing done in connection
with the Officers' summary judgment motions.[6]   In its summary
judgment motion, the City defends each of these claims by
essentially citing to the elements for each cause of action.   Under
these claims, the City contends it cannot be held liable because

---

6 See, Defendant City of Ada's Reply Brief, p. 18.

"the actions of the Defendant Officers were not tortious" or the City did not commit the acts necessary to prevail on these claims. Because the state law claims asserted against Officer Beale survive summary judgment due to a factual dispute on whether he acted within the scope of his employment, whether Officer Beale's actions were tortious remains at issue. "[A] municipality is liable for the tortious acts of police officers committed within the scope of employment as defined by the GTCA." Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1167 (Okla. 2009).[7]  For now, the state law claims against the City will survive until the actions of Officer Beale are definitively determined.

Curiously, this Court finds little in the briefing on the alleged violation of Open Records Act or on the claim for negligent hiring, training, and retention.  Faced with an incomplete record on these subjects, these claims will survive as well.

IT IS THEREFORE ORDERED that Motion for Summary Judgment filed by Defendants Officer Jussely Canada, Officer Michael Meeks, and Officer Phillip Vogt (Docket Entry #93) is hereby **GRANTED** on all

---

[7] The different bases provided by the party Defendants on summary judgment creates part of the conundrum for this Court.  The individual officers moved for summary judgment on the state law tort claims against them on the basis of immunity which turns on the question of whether they acted in the scope of their employment while the City addresses the merits of the claims against the officers.  If it is determined by a jury that Officer Beale acted within the scope of his employment and that he improperly entered Peterson's apartment, some or all of the state law tort claims may be determined to have merit.  At this stage of the proceedings, summary judgment is inappropriate.

claims.   Officers Canada, Meeks, and Vogt are entitled to qualified immunity on the § 1983 claims asserted against them.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendant City of Ada (Docket Entry #94) is hereby **GRANTED** in part, in that summary judgment is entered in favor of the City on the § 1983 claim for the failure to train.  The remainder of the Motion is hereby **DENIED**.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Defendant Officer Marcus Beale (Docket Entry #95) is hereby **GRANTED**, in part, on the § 1983 claim for excessive force but is **DENIED** as it pertains to the § 1983 claim for warrantless entry and the state law claims.

IT IS SO ORDERED this 13th day of October, 2023.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE